IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TURKEY CREEK COMMUNITY INITIATIVES :
  14439 Rippy Road :
  Gulfport, Mississippi :
:
AND :
:
NORTH GULFPORT COMMUNITY LAND :
CONSERVANCY, INC. :
  8208 Ohio Street :
  Gulfport, Mississippi :
:
AND :
:
THE GULF RESTORATION NETWORK :   Civil Action No. 1:07-CV-01507
  338 Baronne Street, Suite 200 :
  New Orleans, Louisiana :   **FIRST AMENDED**
:   **COMPLAINT FOR**
      *Plaintiffs*, :   **DECLARATORY AND**
:   **INJUNCTIVE RELIEF**
*v.* :
:
UNITES STATES ARMY CORPS OF :
ENGINEERS :
  441 G Street, N.W. :
  Washington, D.C. :
:
Serve: Office of the Inspector General CEIG :
      7701 Telegraph Road :
      Alexandria, Virginia  22315 :
:
      *Defendant.* :
:

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs state and allege as follows:

**I.**    **NATURE OF THE ACTION**

      1.    This action, brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq., the Clean Water Act ("CWA"), 33 U.S.C. § 1251, et seq., and

the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., seeks review of the final agency action taken by Defendant, the United States Army Corps of Engineers (the "Corps"), in issuing Regional General Permit SAM-20 (the "RGP") on May 23, 2007. This permit was purportedly issued pursuant to the authority granted to the Corps under § 404 of the CWA, 33 U.S.C. § 1344. The RGP permits the dredge and fill of jurisdictional waters of the United States contained within the Mobile, Alabama District, Regulatory Division's Geographic Boundary of Hancock, Harrison, Jackson, Pearl River, Stone and George Counties, Mississippi. This region hosts many acres of vital wetlands which serve to buffer inland communities from the ravages of hurricanes and inclement weather.

2.  Plaintiffs, Turkey Creek Community Initiatives ("TCCI"), North Gulfport Community Land Conservancy, Inc. ("NGCLC"), and The Gulf Restoration Network ("GRN") (together, "Plaintiffs") assert the following claims against the Corps: First, that the Corps violated NEPA because it failed to complete an Environmental Impact Statement ("EIS") as required by NEPA, 42 U.S.C. § 4332(2)(C). A permit issued by the U.S. Army Corps of Engineers under § 404 of the CWA is a federal action to which NEPA applies. In the alternative, Plaintiffs assert that the Environmental Assessment ("EA") prepared by the Corps in connection with the approval of the RGP is inadequate under NEPA. Second, Plaintiffs assert that the Corps violated NEPA by unlawfully failing to analyze the direct, indirect, secondary and cumulative environmental impacts resulting from the RGP. Third, Plaintiffs assert that the Corps violated its own regulations and statements of policy designed to ensure compliance with NEPA, the CWA and other laws and therefore acted in a manner which is arbitrary, capricious, and an abuse of discretion in violation of the APA, NEPA and the CWA.

## II.  JURISDICTION AND VENUE

3.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 authorize the declaratory relief requested. Injunctive relief is authorized by 28 U.S.C. § 2202. Judicial review of this final agency action is authorized by §§ 10(a), 10(c), and 10(e) of the APA, 5 U.S.C. §§ 702, 704 and 706.

4. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(e) and 5 U.S.C. 703.

### III. PARTIES

5. The North Gulfport Community Land Conservancy, Inc. ("NGCLC") is a non-profit organization, headquartered in Gulfport, Mississippi, formed in 2004 in an effort to address the environmental degradation, wetlands filling, and land speculation and is dedicated to the revitalization of the historic African American community of North Gulfport. This revitalization is addressed through a variety of means including the creation and preservation of affordable housing, involvement in economic development opportunities, and the improvement of local community arts programs. It is the first Community Land Trust in southern Mississippi. This grassroots organization is in the process of developing multiple units of affordable housing for hurricane survivors in North Gulfport. The NGCLC is a membership organization run by its nine board members that represent the North Gulfport community of roughly 6,000 individuals. Its members live in Harrison County, one of the several counties covered by the RGP, and are currently and continue to be impacted by the dredging and filling of wetlands which have made their communities increasingly susceptible to flooding.

6. Turkey Creek Community Initiatives ("TCCI") is an innovative non-profit community development corporation engaged in the comprehensive revitalization of coastal Mississippi's low-income, historic, and environmentally challenged Turkey Creek community and watershed. Community members organized TCCI in 2003 to conserve, restore and utilize for education and other socially beneficial purposes the unique cultural, historical and ecological

assets of their irreplaceable community, creek and coastal stream basin. TCCI has provided direct hurricane relief throughout Harrison County, spearheading local and regional recovery planning in an effort to ensure a healthy, just and environmentally sustainable recovery for the entire gulf coast community. TCCI has eleven board members and a general membership of residents from Gulfport and Biloxi, Mississippi. Its members live in Harrison County, one of the several counties covered by the RGP, and are currently and continue to be impacted by the dredging and filling of wetlands which have made their communities increasingly susceptible to flooding.

7.    The Gulf Restoration Network ("GRN") is a diverse network of groups committed to uniting and empowering people to protect and restore the resources of the Gulf Region. The GRN was formed in 1994 to address threats to coastal and marine resources in Gulf States and to increase communication and coordination of member activities across the region. The GRN is a non-profit Louisiana corporation with its principal place of business in New Orleans, Louisiana, and received its 501(c)(3) status from the IRS in July 1997. The GRN has members, both group and individuals, in each of the Gulf states including Mississippi. The GRN has a long-standing and substantial interest in the protection of water quality in waters that feed the Gulf. For example, the GRN has worked to focus the Mississippi Department of Environmental Quality's attention on problems related to permit issuance and enforcement of National Pollutant Discharge and Elimination permits in the State of Mississippi. Additionally, the GRN mobilized around a proposal that would place dams on three tributaries of Black Creek, Mississippi's only national scenic stream.

8.    Defendant United States Army Corps of Engineers is a branch of the Department of the Army. The Corps is authorized to issue permits for the discharge of dredged

or fill material into navigable waters of the United States pursuant to section 404 of the CWA, 33 U.S.C. § 1344.

## IV. STATUTORY AND REGULATORY FRAMEWORK

### A. Clean Water Act and Implementing Regulations

8.  The stated objective of the Clean Water Act, 33 U.S.C. §§ 1251 et seq., is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. Regulations promulgated pursuant to the CWA govern the discharge of dredged and fill materials into waters of the United States, including wetlands. The regulations establish highly stringent criteria for evaluating proposed discharges of dredged and fill materials in order to protect aquatic systems and avoid rampant, unchecked discharges into such systems. The "Guidelines for Specification of Disposal Sites for Dredged or Fill Material" (the "Guidelines"), codified at 40 C.F.R. Part 230, are regulations promulgated by the Environmental Protection Agency ("EPA") concerning CWA permitting for dredge and fill activities. The Guidelines articulate the highly protective nature of the federal regulatory structure. Certain of the policies and purposes underlying the Guidelines are as follows:

> (c) Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern.
>
> (d) From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines. The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources.

40 C.F.R. § 230.1(c) & (d).

9.  The Corps is the delegated federal agency responsible for administering

the issuance of either individual or general permits for the filling of waters of the United States, and the Corps has established regulations concerning their issuance. See 33 C.F.R. Parts 320-331 and 33 C.F.R. Part 230. The EPA is the delegated federal agency responsible for administering the CWA. The EPA has promulgated the Guidelines, which govern dredge and fill permit application review and emphasize the fundamental importance of wetland preservation. See 40 C.F.R. §§ 230.1-230.80.

10. The CWA requires all persons who wish to discharge dredge or fill material into waters of the United States to acquire first a federal permit. See 33 U.S.C. §§ 1311(a), 1344(a) and (e). "Waters of the United States" is defined to include navigable waterways and "[a]ll other waters, such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sand flats, wetlands, sloughs, . . . the use, degradation, or destruction of which could affect interstate or foreign commerce including any such waters." 33 C.F.R. § 328.3(a)(3). "Waters of the United States" also include wetlands adjacent to other waters included within the definition. See 33 C.F.R. § 328.3(a)(7). The Corps further recognizes in the preamble to its current regulations that "waters of the United States" includes waters "[w]hich are or would be used as habitat for endangered species." 51 Fed. Reg. 41206, 41217.

11. Wetlands and other aquatic systems subject to federal jurisdiction have special, protective criteria for permitting evaluation. The regulations governing the issuance of § 404 permits for alteration of wetlands are codified at 33 C.F.R. §§ 320-330 and 40 C.F.R. §§ 230.1-230.80. These regulations establish very stringent criteria militating against wetland modification. The regulations recognize the value of wetlands preservation, decry their piecemeal destruction, and clearly set forth a presumption against allowing a permit that alters wetlands:

> No permit will be granted which involves the alteration of wetlands identified as important [in the regulation] . . . unless the district engineer concludes . . . that the benefits of the proposed alteration outweigh the damage to the wetlands resource. In evaluating whether a particular discharge activity should be permitted, the district engineer shall apply the section 404(b)(1) guidelines.

33 C.F.R. § 320.4(b)(4).

12.     The fundamental importance of wetland preservation is further emphasized in the Guidelines, which require the a permitting authority to "determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment . . . ." 40 C.F.R. § 230.11. The regulations then provide very elaborate, detailed criteria for evaluating the potential impacts posed by dredge and fill activities in waters of the United States. 40 C.F.R. §§ 230.20-230.61.

13.     Indeed, the CWA regulations establish a presumption that a dredge and fill permit should *not* be issued if the activity seeking the discharge is not water dependent:

> Where the activity associated with a discharge which is proposed for a special aquatic site . . . does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

40 C.F.R. § 230.10(a)(3).

14.     The CWA regulations further provide that a "public interest review" is among the "policies [that] shall be applicable to the review of all applications for [Corps dredge and fill] permits." 33 C.F.R. § 320.4. The regulation requiring a public interest review provides,

in relevant part:

> The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest . . . . All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety . . . .

33 C.F.R. § 320.4(a)(1). The regulations further require that the Corps evaluate the effect of a proposed activity on wetlands because "[m]ost wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b). Functions performed by wetlands that are considered to be important to the public interest include use as study areas, drainage, protection from erosion, valuable storage for storm and flood waters, ground water recharge, water purification, and biological functions such as food chain production, habitat and nesting. See 33 C.F.R. § 320.4(b)(2). The public interest review regulations note that "[a]lthough a particular alteration of a wetland may constitute a minor change, the cumulative effect of numerous piecemeal changes can result in a major impairment of wetland resources. Thus, the particular wetland site for which an application is made will be evaluated with the recognition that it may be part of a complete and interrelated wetland area." 33 C.F.R. § 320.4(b)(3).

15.     Under the CWA, one may obtain permission to discharge dredged or fill materials into waters of the United States through either an individual or a general permit. See 33 U.S.C. § 1344(a) and (e); see also 33 U.S.C. § 1362(7). Individual permits are issued following a "case-by-case evaluation of a specific project involving the proposed discharge(s) . . . ." 33 C.F.R. § 323.2(g). An individual permit, therefore, is issued to allow the

discharge of dredged or fill material into specific wetlands for a single project, which is subject to public review and input, and the details of which must meet various regulatory guidelines and standards. See 33 U.S.C. § 1344. An applicant seeking an individual permit must provide the Corps with, among other things, "a complete description of the proposed activity including necessary drawings, sketches, or plans" and "the location, purpose and need for the proposed activity" and must include descriptions of "[a]ll activities which the applicant plans to undertake which are reasonably related to the same project." 33 C.F.R. § 325.1(d).

16. Conversely, a general permit may be issued on a nationwide or regional basis to allow the discharge of dredged or fill material into wetlands for an entire category or categories of activities, but only when

> (1) Those activities are substantially similar in nature and cause only minimal individual and cumulative environmental impacts; or
>
> (2) The general permit would result in avoiding unnecessary duplication of regulatory control exercised by another Federal, state, or local agency provided it has been determined that the environmental consequences of the action are individually and cumulatively minimal.

See 33 C.F.R. § 323.2(h), 33 U.S.C. § 1344(e).

### B.  NEPA and Implementing Regulations

16. "NEPA, first of all, makes environmental protection a part of the mandate of every federal agency and department." Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, 449 F.2d 1109, 1112 (D.C. Cir. 1971). "Perhaps the greatest importance of NEPA is to require . . . agencies to *consider* environmental issues just as they consider other matters within their mandates." Id. (emphasis in original). NEPA's essential purpose is "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the

environment." 40 C.F.R. § 1500.1(c). The Council on Environmental Quality ("CEQ") -- an agency within the Executive Office of the President -- has promulgated regulations implementing NEPA, which have been adopted by the Corps. See 40 C.F.R. §§ 1500-1508.

17. To accomplish its purpose, NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). This statement, known as an Environmental Impact Statement ("EIS"), must describe "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." Id.

18. To determine whether an agency needs to perform an EIS, the agency must prepare an environmental assessment ("EA") discussing the need for the proposed action, alternatives, and the environmental impacts of the proposed action and alternatives. See 40 C.F.R. §§ 1501.4 and 1508.9. The Corps has promulgated its own regulations implementing NEPA. See 33 C.F.R. § 230 et seq. In conjunction with CEQ's regulations, the Corps requires that an EA must "provide sufficient information to the district commander on potential environmental effects of the proposed action and, if appropriate, its alternatives . . . ." 33 C.F.R. § 230.10(a).

19. Based on the EA, and consulting regulations promulgated by the CEQ, the agency will then either prepare an EIS or issue a Finding Of No Significant Impact ("FONSI"). A FONSI is permitted only if the proposed action will not significantly affect the environment.

See 33 C.F.R. § 230.11, 40 C.F.R. § 1508.13. The FONSI determination must be supported by a statement of reasoning and evidence, not merely conclusions.

## V.    FACTUAL BACKGROUND OF REGIONAL GENERAL PERMIT SAM-20

20.    Hurricane Katrina's destructive power highlighted the important role that wetlands play in storm protection and flood control. Coastal wetlands serve as the first line of hurricane defense, helping to decrease storm surges and dissipate hurricane forces. Once a storm makes landfall, both inland and coastal wetlands continue to protect against hurricane damage by collecting and controlling floodwaters. In hurricane prone areas, such as coastal Mississippi, the importance of wetlands cannot be overstated.

21.    Plaintiffs, and their members, experienced the devastation of flooding brought on by Hurricane Katrina. Their homes and offices took in several feet of water, causing significant damage to their real and personal property.

22.    On October 10, 2006, the Army Corps published a proposed RGP that would have permitted the discharge of dredged and fill materials into up to five acres of jurisdictional waters of the United States contained within the Mobile District, Regulatory Division's Geographic Boundary of Hancock, Harrison, Jackson, Pearl River, Stone and George Counties, Mississippi. After receiving approximately 7,500 comments from the public, all but 45 in opposition to the proposed RGP, the Corps revised its proposed RGP. The second proposed RGP, published on February 9, 2007, reduced the acreage of impacted waters from five to three, excluded commercial buildings, and exempted the Turkey Creek watershed which accounts for only 0.4% of the 2.5 million acres covered by the RGP. Plaintiffs, as well as many other concerned community groups, submitted comments in opposition of the revised RGP.

23.    Despite the demonstrated importance of wetlands and the immense public opposition to the first and second proposed RGPs, on May 23, 2007, the Corps issued the RGP to

permit the discharge of dredged and fill materials into jurisdictional waters of the United States contained within the Mobile District, Regulatory Division's Geographic Boundary of Hancock, Harrison, Jackson, Pearl River, Stone and George Counties, Mississippi. This region hosts many acres of vital wetlands which serve to buffer inland communities from the ravages of hurricanes and inclement weather.

24.     The RGP authorizes dredge and fill activities required for the construction or expansion of residential building foundations and building pads and attendant features that are necessary for the use and maintenance of the structures. Residential development authorized by the RGP includes multiple and single unit developments. Attendant features authorized by the RGP include, but are not limited to, roads, parking lots, garages, yards, utility lines, and stormwater management facilities. No public review or comment is required for any activity authorized by the RGP.

25.     Each project authorized by the RGP may impact up to three acres of "low quality" wetlands. Despite the demonstrated importance of wetlands, the RGP allows the destruction of wetlands on an unprecedented level. Generally, the upper limit of areas that can be authorized for wetland fill under the Corps's nationwide general permits is half an acre. Since the RGP allows each project authorized thereunder to impact up to three acres of wetlands, the RGP would allow wetland development in hurricane-prone areas at six times the national standard. Removal of wetlands at the scale authorized by the RGP will significantly worsen flooding during the next hurricane.

26.     Increased development in wetlands authorized by the RGP would exacerbate current flood control problems and cause other ecological damage. The RGP is an irresponsible approach to ecological and flood control management in the wake of Hurricane

Katrina.

27. The RGP is effective until May 23, 2009. Projects authorized under the RGP that have commenced or are under contract to commence on May 23, 2009 may be completed within twelve months following such date.

28. In connection with the RGP, the Corps also issued on May 23, 2007 its Environmental Assessment, 404(b)(1) Analysis, Statement of Findings, and Decision Document (the "Environmental Assessment").

29. In the Environmental Assessment, the Corps estimates that approximately 48,416.60 acres of wetlands in coastal Mississippi have the potential to be affected (i.e. filled in) by the RGP. See Environmental Assessment at p. 32.

30. While the Corps is required to evaluate alternatives to the activities authorized by the RGP, see, e.g., 40 C.F.R. §§ 1501.4 and 1508.9 and 33 C.F.R. § 230.10(a), the Corps utilized less than two pages in the Environmental Assessment to assess only two alternatives: (i) not to issue the RGP or (ii) to issue the RGP. See Environmental Assessment at pp. 27-28. In effect, the Environmental Assessment proposes the RGP as the only alternative to taking no action at all.

31. The Corps concluded that the activities authorized by the RGP will not significantly affect the quality of the human environment and, therefore, the Corps did not prepare an EIS.

## VI. PLAINTIFFS' CLAIMS FOR RELIEF

### A. COUNT ONE (NEPA)

32. Plaintiffs repeat and incorporate herein by reference the allegations set forth in paragraphs 1-29.

33. The Corps' determination that the RGP-SAM-20 should be implemented

as a means to save time in the permitting review process and foregoing public notice of a proposed project is contrary to NEPA and is arbitrary, capricious and an abuse of discretion in violation of the APA, 5 U.S.C. § 706(2).

34. In the alternative, the EA prepared by the Corps for the RGP-SAM-20 is arbitrary, capricious and an abuse of discretion in violation of the APA, 5 U.S.C. § 706(2).

35. The Corps' finding of no significant impact ("FONSI") and Environmental Assessment ("EA") analyzing the direct, indirect, secondary and cumulative environmental impacts of the RGP-SAM-20 authorizing the general filling of up to three acres of "low-quality" wetlands is contrary to the NEPA, 42 U.S.C. § 4332(2)(C), the Mississippi Department of Environmental Quality and Mississippi Department of Marine Resources implementing regulations, and is arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

36. The Corps' failure to fully evaluate less damaging alternatives to RGP-SAM-20 or avoidance of dredge and fill in waters of the United States, as required by NEPA, is action that is arbitrary, capricious and an abuse of discretion in violation of the APA, 5 U.S.C. § 706(2).

**B.    COUNT TWO (CWA and CORPS REGULATIONS)**

37. Plaintiffs repeat and incorporate herein by reference the allegations set forth in paragraphs 1-34.

38. In failing to follow its own regulations and statements of policy designed to ensure compliance with the CWA, NEPA and other laws, the Corps has violated its own regulations, and has therefore acted in a manner which is arbitrary, capricious, and an abuse of discretion, in violation of the APA, 5 U.S.C. § 706(2). These violations include, but are not

limited to:

 (a) In issuing RGP-SAM-20, which has more than a minimal impact on the environment in Mississippi, the Corps has violated the CWA.

 (b) In authorizing dredge and fill in up to three acres of wetlands which serve as valuable storage areas for storm and flood waters, the Corps has violated CWA regulation 33 C.F.R. § 320.4(b)(2)(v).

 (c) The Corps failed to engage in the sequencing guidelines evaluation set forth in 33 C.F.R. §230.10, which require the evaluation of "practicable alternatives" to the proposed discharges into waters of the United States when the proposed activity is not water-dependent.

## VII. PRAYER FOR RELIEF

 WHEREFORE, Plaintiffs pray that this Honorable Court will:

 39. Declare that the Corps of Engineers' issuance of the RGP-SAM-20 was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law and constitutes a violation of NEPA, the CWA and the APA;

 40. Declare that the RGP-SAM-20 is invalid and void;

 41. Declare that all authorizations and approvals issued by the Corps pursuant to the RGP-SAM-20 are invalid;

 42. Preliminarily and permanently enjoin filling of wetlands under RGP-SAM-20;

 43. Award Plaintiff its reasonable attorney's fees, costs and expenses pursuant to 28 U.S.C. § 2412, the Equal Access to Justice Act and Fed.R.Civ.P. 54(d); and

 44. Grant such further relief as the Court deems just and proper.

DATED: October 11, 2007                    Respectfully submitted,

*[signature]*

Constantinos G. Panagopoulos # 430932
Charles W. Chotvacs # 484155
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
601 13th Street, N.W.
Suite 1000 South
Washington, D.C. 20005-3807
Telephone: (202) 661-2200
Facsimile: (202) 661-2299
E-mail: cgp@ballardspahr.com
E-mail: chotvacsc@ballardspahr.com

Richard M. Hluchan (admitted *pro hac vice*)
Alan K. Motes (admitted *pro hac vice*)
Robert S. Baranowski, Jr (admitted *pro hac vice*)
Jennifer E. Simon (admitted *pro hac vice*)
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

Daria E. Neal
ENVIRONMENTAL JUSTICE PROJECT
LAWYERS' COMMITTEE FOR CIVIL
   RIGHTS UNDER LAW
1401 New York Avenue, N.W., Suite 400
Washington, D.C. 20005
Telephone: (202) 662-8600

*Counsel for Plaintiffs*